```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION
```

MCKESSON GLOBAL SOURCING
LIMITED, an active foreign
private limited company,

        Plaintiff,

v.                                    Case No:  2:21-cv-782-JES-NPM

M.C. JOHNSON CO., INC., a
Florida profit corporation,
dba PRIVATE LABEL MEDICAL,
and aka M.C. JOHNSON
COMPANY, INC.,

        Defendant.

_____

## OPINION AND ORDER

This matter comes before the Court on defendant's Motion to Dismiss Count I of Plaintiff's Second Amended Complaint (SAC) and Supporting Memorandum of Law (Doc. #40) filed on February 15, 2022. Plaintiff filed a Response (Doc. #41) on March 8, 2022.

This civil action arises from mistaken overpayments of monies by Plaintiff McKesson Global Sourcing Limited (plaintiff or McKesson Global) to Defendant M.C. Johnson Co., Inc. (defendant or MCJ). The operative SAC asserts four claims: (1) breach of contract; (2) conversion; (3) money had and received; and (4) unjust enrichment.  (Doc. #39.)  The pending Motion to Dismiss (Motion) only seeks dismissal of Count I.  (Doc. #40.)  For the reasons set forth, the motion is **DENIED**.

I.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." Id. at 555; see also Edwards v. Prime Inc., 602 F.3d 1276, 1291 (11th Cir. 2010). This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to the plaintiff, Erickson v. Pardus, 551 U.S. 89, 94 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Factual allegations that are merely consistent with a defendant's liability fall short of being

2

facially plausible.  Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (citations omitted).  When an exhibit attached to a complaint contradict general and conclusory allegations, the exhibit governs.  Gill as Next Friend of K.C.R. v. Judd, 941 F.3d 504, 514 (11th Cir. 2019).  Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.

## II.[1] [2]

### (1)  The Parties

Plaintiff McKesson Global is a foreign corporation "wholly owned by PSS Global Sourcing Hong Kong Limited ('PSS Trustee') acting as a trustee for PSS Global Sourcing China Business Trust

---

[1] The facts are taken from the SAC and attached exhibits. The Court may consider these attachments without converting the Motion into a motion for summary judgment. Solis-Ramirez v. U.S. Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985); see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

[2] In the Motion, MCJ often discusses the allegations made in the First Amended Complaint (FAC) and how those differ from the SAC. (Doc. #22.)  The Court already dismissed without prejudice the FAC and granted leave to file the SAC. (Doc. #37.)  The SAC supersedes the FAC, and the Court only considers the allegations of the SAC. See Seiger v. Philipp, 735 F. App'x 635, 638 (11th Cir. 2018) (quoting Pintando v. Miami-Dade Hous. Agency, 501 F.3d 1241, 1243 (11th Cir. 2007) (recognizing a stand-alone, amended complaint nullifies any contradictions from prior complaints).

3

('PSS Trust')." (Doc. #39, ¶ 1.)  Both PSS Trustee and PSS Trust are wholly owned and controlled by McKesson Corporation, an American company.  (Id. ¶¶ 1, 56.) McKesson Corporation "has ultimate ownership and control over [McKesson Global] and [McKesson Global] is a wholly owned subsidiary of McKesson Corporation."  (Id. ¶ 1.)  McKesson Global "is in the business of purchasing and distributing medical devices and healthcare products manufactured by others including to its U.S. based customer, Cypress Medical Products, LLC ('Cypress')."  (Id. ¶ 8.) McKesson Global "is the global sourcing organization for McKesson Corporation focusing on over-the-counter and medical-surgical products and working with global suppliers to drive efficiencies of scale in its supply chain."  (Id. ¶ 57.)

Defendant MCJ also does business as "Private Label Medical." (Id. ¶ 4.)  MCJ "is a manufacturing and distribution company that manufactures and distributes medical devices and healthcare products."  (Id. ¶ 9.)  MCJ contracts with companies, like McKesson Global, "to distribute those products through all major distribution channels in the United States including to national and regional wholesalers."  (Id.)

**(2)  The Agreements**

<u>N95 Masks and Refund Agreements</u>.  On March 24, 2020, MCJ and McKesson Global entered into the N95 Masks Agreement.  (Doc. #39, ¶ 10; Doc. #39-19.)  On March 25, 2020, MCJ executed a confirmation

4

letter to the N95 Masks Agreement (Refund Agreement). (Doc. #39-20, p. 2).[3] Pursuant to the N95 Masks and Refund Agreements, McKesson Global agreed to purchase from MCJ, and MCJ agreed to supply and deliver, shipments of N95 masks throughout the year. (Doc. #39, ¶ 10.) Before fulfilling and delivering any purchase orders, MCJ required McKesson Global to deposit monies with MCJ so that MCJ could pay for the raw materials necessary to manufacture the masks. (Id. ¶ 11.) MCJ agreed to refund to McKesson Global any unused deposits. (Id. ¶ 12.)

On March 24, 2020, McKesson Global tested its ability to electronically transfer funds to MCJ through a penny test. (Id. ¶ 13; Doc. #39-1, p. 3.) Following the penny test, and pursuant to the N95 Masks and Refund Agreements, McKesson Global electronically transferred monies to MCJ on three separate occasions: (1) $642,600 on March 25, 2020 (Doc. #39-1, p. 4); $960,000 on March 27, 2020 (id. p. 5); and (3) $375,750 on May 1, 2020 (Doc. #39-2, p. 2). In total, McKesson Global deposited $1,981,350 to MCJ. (Doc. #39, ¶ 14.)

EFT Agreement. On June 5, 2020, MCJ and McKesson Corporation, on behalf of itself and "its affiliates" entered into the Electronic Payment Agreement (EFT Agreement). (Docs. ## 39, ¶ 58;

---

[3] Page numbers refer to those generated by the Court's electronic filing system (upper right-hand corner) and do not always correspond with the page number at the bottom of a document.

39-18, p. 2.)  The Agreement provided McKesson Corporation and "its affiliates" with the option of paying for purchases from MCJ via electronic funds transfers.  (Doc. #39, ¶ 58.)  The EFT Agreement further provided:

> In the event of duplicate payment, overpayment, fraudulent payment, or payment made in error, [MCJ] agrees to immediately return any such payment to McKesson, after McKesson provides reasonable information, documenting any such duplicate payment, overpayment, fraudulent payment, or payment made in error.
>
> All provisions of any other agreements between McKesson and [MCJ] shall remain in full force and effect except all terms and conditions of such agreements concerning the method and timing of payment for goods and services shall be amended to reflect the provisions of this Agreement.

(Doc. #39-18, p. 3.)  Although the EFT Agreement supersedes any provisions of prior agreements, such as the N95 Masks and Refund Agreements, "concerning the method and timing of payment," the EFT Agreement is a stand-alone agreement between MCJ and McKesson Corporation and its affiliates that requires MCJ to immediately return to McKesson Corporation and its affiliates any payments made in error.  (Doc. #39, ¶ 67.)

### (3) The Purchase Orders and Invoices

On March 26, 2020, McKesson Global issued 7 different purchase orders with MCJ with varying shipment dates in 2020: April 5, April

6

5, April 15, May 5,[4] May 15, May 25, June 5.  (Docs. ## 39, ¶ 15; 39-3 through 39-8.)  After the first three shipments were fulfilled by MCJ, McKesson Global paid for the corresponding invoices via electronic money transfers.  (Docs. ## 39, ¶¶ 16-24; 39-1, p. 6; 39-9; 39-10.)

Sometime thereafter, MCJ informed McKesson Global that the costs of its N95 masks would be increasing.  (Doc. #39, ¶ 25.)  Due in part to the increase in costs, the parties mutually and amicably agreed that MCJ would fulfill the remaining four purchase orders, but no additional orders would be fulfilled.  (Id. ¶ 26.)  The parties worked together to determine if McKesson Global's deposit would cover the cost of the remaining orders, and whether McKesson Global would owe additional monies or MCJ would need to refund part of the deposit.  (Id. ¶ 27.)  MCJ fulfilled the final four purchase orders, and those invoices were completely covered by McKesson Global's deposit.  (Id. ¶¶ 28, 30.)  The final invoices were dated May 18, May 28, June 18, and June 30, 2020.  (Docs. ## 39-12 through 39-15.)  On June 22, 2020, MCJ refunded McKesson Global's remaining deposited amounts, which totaled $716,586.  (Docs. ## 39, ¶ 29; 39-11, p. 3.)

---

[4] The purchase order for the May 5, 2020 shipment is not included as an exhibit to the SAC.

### (4) The Overpayments

Around this same time, McKesson Global made changes to its existing accounts payable system and responsible personnel. (Doc. #39, ¶ 32.) The changes resulted in mistakes and errors. On July 3, 2020, McKesson Global returned $337,836 of the refunded deposit it had received from MCJ. (Id. ¶¶ 32-33, 34-36.) On July 21, August 6, and August 20, 2020, McKesson Global made payments representing three of the four final invoices that were already covered by McKesson Global's deposited monies. (Id. ¶¶ 32-33, 37-45; Docs. ## 39-13 through 39-17.) Ultimately, McKesson Global transferred $1,314,964 in overpayments to MCJ. (Doc. #39, ¶ 33.)

In or around March 2021, McKesson Global discovered the overpayments and advised MCJ of the error. (Id. ¶¶ 46-47.) MCJ, although acknowledging the overpayments, refused to return the monies. (Id. ¶ 49.) Instead, MCJ claimed it was entitled to use the overpayment as a setoff against amounts owed to MCJ by McKesson Medical-Surgical, Inc. (MMS) for a dispute which arose between MCJ and MMS on September 25, 2020. (Id. ¶¶ 49-50.) McKesson Global, in turn, explained to MCJ that MMS is a separate and distinct legal entity from McKesson Global, thus, there was no basis to use the overpayment as a setoff for monies allegedly owed by MMS. (Id. ¶ 52.) MCJ, however, still refused to return the overpayment, leading to the current litigation.

### III.

MCJ only moves to dismiss Count I of the SAC.[5] Count One asserts that MCJ materially breached the N95 Masks, Refund, and EFT Agreements (collectively, the Agreements) by, among other things, "failing to return the Overpayments to Plaintiff." (Id. ¶ 73.) MCJ argues that Count I fails to state a claim for two main reasons.[6] (Doc. #40.) First, MCJ argues that McKesson Global cannot assert a breach of the EFT Agreement because McKesson Global is not an intended beneficiary of the EFT Agreement. (Id. pp. 14-16.) Second, MCJ argues that McKesson Global cannot assert a breach of the Agreements because, at the time McKesson Global requested return of the overpayments, all parties had fully complied with the Agreements, the Agreements had been terminated, and a party cannot recover under any agreement that has been fully performed. (Id. pp. 16-24.) The Court addresses each argument in turn.

---

[5] In the Motion, MCJ refrains from using the name "McKesson" when identifying plaintiff, going so far as to modify the case caption. MCJ is directed to use the correct case caption in all future filings.

[6] In a brief paragraph, MCJ argues that the SAC is a shotgun pleading because, in MCJ's view, the SAC's allegations related to the first three purchase orders are immaterial to the dispute. (Doc. #40, p. 14 (citing Doc. #39, ¶¶ 16-24).) These paragraphs, however, describe electronic transfer payments of invoices prior to the EFT Agreement and are not necessarily immaterial to McKesson Global's claims.

### A.

"A person who is not a party to a contract may not sue for breach of that contract where that person receives only an incidental or consequential benefit from the contract." Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd., 647 So. 2d 1028, 1030–31 (Fla. 4th DCA 1994) (citing Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla. 1985)). "The exception to this rule is where the entity that is not a party to the contract is an intended third party beneficiary of the contract." Id. (citing Jacobson v. Heritage Quality Constr. Co., 604 So.2d 17 (Fla. 4th DCA 1992), dismissed, 613 So.2d 5 (Fla. 1993)). "A third party is an intended beneficiary, and thus able to sue on a contract, only if the parties to the contract intended to primarily and directly benefit the third party." Williams v. CVT, LLC, 295 So. 3d 883, 887 (Fla. 2d DCA 2020) (citations omitted). Thus, as a Florida court explained:

> [I]n order to plead a cause of action for breach of a third party beneficiary contract, the following elements must be set forth:
>
> (1) a contract between A and B;
>
> (2) an intent, either expressed by the parties, or in the provisions of the contract, that the contract primarily and directly benefit C, the third party (or a class of persons to which that party belongs);
>
> (3) breach of that contract by either A or B (or both); and
>
> (4) damages to C resulting from the breach.

10

<u>Caretta</u>, 647 So.2d at 1031.

McKesson Global has plausibly alleged that it may enforce the EFT Agreement as an intended beneficiary. The EFT Agreement states that it "is by and between McKesson Corporation and its affiliates[7] ('McKesson') and [MCJ]." (Doc. #29-18 p. 2.) The essential allegations are that McKesson Global is owned by PSS Trustee, acting as trustee of PSS Trust, PSS Trustee and PSS Trust are wholly owned by McKesson Corporation, and McKesson Corporation ultimately controls and owns McKesson Global. (Doc. #39, ¶ 1, 56.) McKesson Global also "is the global sourcing organization for McKesson Corporation focusing on over-the-counter and medical-surgical products and working with global suppliers to drive efficiencies of scale in its supply chain." (<u>Id.</u> ¶ 57.) Although these allegations may or may not withstand the test of future discovery, they are sufficiently plausible to show that McKesson Global is intended beneficiary of the EFT Agreement as an affiliate of McKesson Corporation, if not an actual party to the agreement. The SAC satisfies McKesson Global's pleading burden.

---

[7] The EFT Agreement does not define "affiliate." An affiliate is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." AFFILIATE, Black's Law Dictionary (11th ed. 2019). MCJ does not discuss whether McKesson Global could be an actual party to the EFT Agreement as an affiliate.

**B.**

"Contracts are typically considered complete upon each party's fulfillment of its contractual duties." Baker Cty. Med. Servs., Inc. v. Summit Smith L.L.C., No. 3:05-CV-541-J-33HTS, 2007 WL 1229702, at *3 (M.D. Fla. Apr. 25, 2007) (citing Restatement (Second) of Contracts § 235, cmt. a ("Under the rule stated in Subsection (1), a duty is discharged when it is fully performed. Nothing less than full performance, however, has this effect and any defect in performance, even an insubstantial one, prevents discharge on this ground.")).

However, "termination of a contract operates only as a prospective remedy and fails to extinguish retroactively the vested rights and obligations of a party." Insurdata Mktg. Servs., LLC v. Healthplan Servs., Inc., 352 F. Supp. 2d 1252, 1257 (M.D. Fla. 2005) (citing Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd., 99 F.3d 746, 753-754 (5th Cir. 1996) (termination of an agreement fails to affect rights and obligations that accrue during the life of the contract)); see also Feldkamp v. Long Bay Partners, LLC, 773 F. Supp. 2d 1273, 1282 (M.D. Fla. 2011), aff'd, 453 F. App'x 929 (11th Cir. 2012) ("the refund obligation remained a vested contractual right" even after defendant tried to amend ability to seek a refund).

MCJ argues that McKesson Global fails to sufficiently state a breach of contract claim because there were no longer any

12

contractual obligations between the parties when McKesson Global requested the refund in March 2021. (Doc. #40, pp. 16-24.) In MCJ's view, if the EFT Agreement applies,[8] all obligations pursuant to the Agreements were fulfilled within 60 days of June 30, 2020 (the last invoice), because invoices allowed for payment within 60 days. (Id. pp. 21-24.) And, McKesson Global cannot now seek to enforce a contract that was fully performed and terminated.

The Court disagrees. As already discussed, McKesson Global plausibly alleges that it may enforce the EFT Agreement. As alleged, the EFT Agreement is a stand-alone agreement which requires MCJ to immediately return overpayments after McKesson Corporation or its affiliates provide reasonable information. There is no timing provision in the EFT Agreement nor does the SAC allege that the EFT Agreement was ever terminated. The SAC plausibly states a breach of the EFT Agreement because MCJ has refused to refund the overpayments.

Even assuming MCJ's "60-days from June 30, 2020" theory is true, the SAC alleges that all overpayments were made by August 20, 2020, which was within that 60-day window. McKesson Global's right to seek a refund of overpayments vested before the end of

---

[8] MCJ also discusses why McKesson Global fails to state a breach of N95 Masks and Refund Agreements if the EFT Agreement does not apply. Because the Court already determined that McKesson Global plausibly states it is a party to or intended beneficiary of the EFT Agreement, it is unnecessary to consider that argument.

the Agreements, as asserted by MCJ. Thus, at this early stage in the proceedings and based on the current pleadings, there are certainly factual disputes concerning whether full performance occurred and whether the Agreements terminated, if ever, making this issue improper on a motion to dismiss.

Accordingly, it is now

**ORDERED:**

Defendant's Motion to Dismiss (Doc. #40) is **DENIED**.

**DONE and ORDERED** at Fort Myers, Florida, this __10th__ day of March, 2022.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record

14